## AYLWARD v. NEE.
### No. 3585.

District Court, W. D. Missouri, W. D.
Jan. 29, 1947.

John C. Grover, J. L. Milligan and Arthur L. Ross, all of Kansas City, Mo., for plaintiff.

Sam M. Wear, U. S. Atty. and Earl A. Grimes, Asst. U. S. Atty., both of Kansas City, Mo., Douglas W. McGregor, Asst. Atty. Gen., Andrew D. Sharpe, Homer R. Miller and Rhodes S. Baker, Jr., Sp. Assts. to Atty. Gen., for defendant.

COLLET, District Judge.
### Findings of Fact.

1. This is an action for recovery of income and excess profits taxes by the trustee of the bankrupt United Funds Management Corporation. The latter will be referred to hereafter as the Corporation.

2. The Corporation duly and timely filed its income and excess profits tax returns for the calendar years 1939 and 1940 and its capital stock tax returns for the years ended June 30, 1939 and June 30, 1940. It paid the taxes reported in its returns and subsequent assessments in the total amount of $15,299.55. Claims for the refund of income and excess profits taxes for the years 1939 and 1940 plus interest were duly and timely filed, were rejected and this action therefor was duly and timely filed.

3. Claim for the refund of capital stock taxes for the years ended June 30, 1939 and June 30, 1940, in the respective amounts of $182 and $202.30 plus interest, was duly and timely filed. On June 10, 1943, these claims were formally rejected by the Commissioner of Internal Revenue in the amount of $380.10 and allowed in the amount of $4.20. This action was filed on September 27, 1945.

4. The Corporation was engaged in the business of selling "investment certificates." These certificates provided that on the happening of one of several alternative contingencies the Corporation would pay the certificate holder different stated sums of money. The certificate holder paid the Corporation stipulated amounts, sometimes monthly, sometimes semi-annually and sometimes annually. (Many other refinements were contained in the certificate which for present purposes need not be mentioned.) If the certificate holder did not continue making his payments to the so-called "maturity date" of the certificate he received a lower rate of return or interest on the payments he had made. If he discontinued his payments and permitted his certificate to lapse before a certain number of payments had been made he not only did not receive any interest on the payments he made, but also lost the payments made. By the terms of the certificates the Corporation was authorized to use a stipulated portion of his payments for expenses and commissions characterized as "loading charges." If he stopped making payments for a time and then resumed them he received no interest on the payments theretofore made during the lapsed period.

5. In 1935 the Corporation made a study of the amount which it was necessary to add periodically to the amount paid in by the certificate holder to equal the amount which the certificate holder would be entitled to withdraw. It was determined that if 4½% of the amount paid in by all certificate holders and certain accruals thereon, was set aside semi-annually by the Corporation in a reserve fund, the amount of that reserve would be at all times adequate to pay the certificates as they matured or were surrendered prior to maturity. Such an amount was set aside to this reserve fund semi-annually each year thereafter including 1939 and 1940.

In addition to the reserve fund the certificate holders were further secured by a pledge of securities by the Corporation with an Indenture Trustee having a value of 110% of the Corporation's existing certificate obligations.

6. This composite rate of 4½% was based on the assumption that the performance of certificate holders in lapsing their certificates, surrendering them prior to maturity and in exercising other options more advantageous to the Corporation than carrying them to maturity, which had been followed in previous years of the Corporation's experience, would continue in the future. If all certificate holders continued their certificates to maturity the composite 4½% rate would be inadequate to create sufficient funds to pay the maturity value of all certificates.

7. Early in 1940 the Corporation discontinued the sale of the investment certificates now involved.

8. For the taxable years 1939 and 1940 (which years alone are involved in the present action), the Corporation calculated the amount to be set aside to the reserve by applying the 4½% composite rate, deducted this amount and expenses from its total gross receipts and treated the balance of its receipts as income, reporting and using it as such. The Corporation adopted such forms and systems of accounting and maintained such accounting records as in its judgment were best suited to its purposes to enable it to make a return of its true income as required by the Internal Revenue Laws. The tax returns filed by the Corporation for the calendar years 1939 and 1940 were made in accordance with the method of accounting adopted and consistently maintained by it. It kept its books and reported its income for income tax purposes on a cash receipts and disbursements basis.

9. In September 1942 the Securities and Exchange Commission after protracted investigation of and negotiations with the Corporation, brought an injunction suit to restrain the continued operation of the Corporation unless it set aside in the reserve fund $1,500,000 of additional funds to make that reserve adequate to discharge all of the outstanding certificates in the event each and every one of them was carried to maturity and the Corporation was thereby required to pay to each the full maturity value. This sum was based upon an actuarial study made for the Corporation by a Consulting Actuary designated by the Securities and Exchange Commission and it assumed "perfect performance" by all certificate holders i. e. the performance most disadvantageous to the Corporation. The Corporation was unable to make this deposit to the reserve fund and bankruptcy followed.

10. Upon the assumption of perfect performance of all outstanding certificate holders the amount which it would have been necessary for the Corporation to set aside in the reserve fund in addition to the amount actually set aside was more in both 1939 and 1940 than the amount of income for which the taxes now sued for were paid. Otherwise stated, if the business of the Corporation had been conducted on the basis which the Securities and Exchange Commission later demanded it be restored to, the operation of the Corporation for those years would not have justified the payment of the income and excess profits taxes paid and now sued for.

11. The discontinuance of the Corporation's business under compulsion of the demands of the Securities and Exchange Commission makes the determination of:

what the actual performance of the certificate holders would have been and the Corporation's actual and real profit and income impossible.

### Conclusions of Law.

I. The burden of proof is upon the plaintiff to establish the facts upon which he seeks to recover.

II. The proof establishes a contingent liability on the part of the Corporation to its certificate holders which, occurring, would have resulted in a loss instead of an income for the taxable years 1939 and 1940. Contingent liabilities may not be made the basis for deductions under the Internal Revenue Law. Nor do considerations of fairness and equity constitute a basis for determining deductions under the Revenue Act. See Shapleigh Hardware Co. v. United States, 8 Cir., 81 F.2d 697.

III. No such inhibitions were involved in Commonwealth of Pennsylvania v. Aylward, 8 Cir., 154 F.2d 714. That case was determined upon principles of substantial justice without the application of established rules under the Revenue Act. It is no authority in this case.

IV. The plaintiff's complaint should be dismissed on the merits.